**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**Case No. 6:10-cv-512-Orl-31KRS**

RUSSELL NOONAN, and
DENISE NOONAN, his wife,

      Plaintiffs,

v.

VERMONT MUTUAL INSURANCE
COMPANY,

      Defendant.

_____/

**DEFENDANT'S MOTION FOR FINAL SUMMARY JUDGMENT**
**AND INCORPORATED MEMORANDUM OF LAW**

Defendant, Vermont Mutual Insurance Company ("VM"), by and through its

undersigned counsel and pursuant to Fed. R. Civ. P. 56, hereby moves this Court for an

Order of Final Summary Judgment in its favor and in support thereof states as follows:

      1.    This action is derivative of an underlying Florida tort action in which

Russell and Denise Noonan (collectively, "Noonan") sued Ronald Robbins ("Robbins")

because of an auto accident in Florida.

      2.    Robbins, a New Hampshire citizen, was insured at all relevant times under

two auto policies.  The policy which provided primary coverage under the circumstances

was issued by Allstate.  The policy which provided excess coverage was issued by VM.

The applicable policy limit of each policy was $100,000.

      3.    Before the Noonan claim was in suit, both Allstate and VM investigated

the claim.  Both insurers requested Russell Noonan's medical records and invoices from

Noonan's counsel, David Gorewitz ("Gorewitz") on several occasions, but none were provided.  Instead, Noonan brought the underlying action against Robbins.

4.      Once the underlying action was commenced, Allstate defended the underlying action as the primary insurer and provided information to VM.  VM also continued to conduct its own investigation.

5.      On November 21, 2005, Allstate tendered its $100,000 policy limit to Noonan.

6.      Allstate-retained defense counsel sought Noonan's medical records. Curiously, Noonan objected to that discovery.  Noonan only agreed to provide the medical information when threatened with a motion to compel.  Once defense counsel received the records, he forwarded them to Allstate and VM.

7.      Within a matter of days after VM had received and reviewed Noonan's medical records, VM advised defense counsel to tender its $100,000 limit to Noonan.

8.      As of the date VM tendered its limit, Noonan had never made a demand.

9.      Notwithstanding that Noonan had never made a demand, and notwithstanding that VM tendered its limit within days after receiving Noonan's medical records, Noonan rejected VM's tender as "untimely."

10.      Noonan, Robbins and VM entered into a type of "Cunningham" agreement wherein the parties agreed to a consent judgment with a covenant not to execute against Robbins, and Noonan brought this "bad faith" action.

11.      VM has already paid its $100,000 policy limit to Noonan.  The only question before this Court is whether VM owes additional "extra-contractual" monies to satisfy the consent judgment.  The answer to that sole question depends on whether VM's

failure to tender its policy limit in the absence of a demand and before receiving a single medical record or invoice constitutes "bad faith."

12.     For the reasons stated herein, no reasonable factfinder could find that VM acted in "bad faith" under the circumstances.   VM was not required to tender its policy limit based on mere representations.   Instead, VM was entitled to some minimal documentation.   In addition, VM cannot be in "bad faith" where it tendered its policy even before receiving a demand.

13.     Further, any alleged delay in VM's tender of its policy limit was due to the conduct of Noonan and his counsel.   Whether Noonan's failure to provide medical information that had been requested on several occasions was based on neglect or an attempt to achieve a "bad faith setup," Noonan must not benefit from such conduct.

14.     VM's claims handling and investigation occurred in Vermont, thus, whether VM acted in "bad faith" is to be determined under Vermont law.

15.     There is no legitimate dispute of a material fact and VM is entitled to summary judgment as a matter of law.

## MEMORANDUM OF LAW

### I.      INTRODUCTION

In this case, the Noonans allege "bad faith" premised upon VM's purportedly "untimely" tender of its policy limit.   Although there had been no demand and although VM had absolutely no medical records or invoices, Noonan alleges that VM had "sufficient" information, knew that this was a case of clear liability, and was aware that Russell Noonan's damages greatly exceeded the available policy limits.[1]   Despite

---

[1] *See generally* Compl., ¶ 8 [D.E. 3].

Noonan's attempt to characterize VM's conduct as being in "bad faith," however, the undisputed facts and well-settled law indicate that the opposite conclusion is appropriate.

Applying the facts of this case to other "bad faith" cases in Vermont, Florida and other jurisdictions, it is evident that VM's conduct cannot be characterized as "bad faith." As the undisputed evidence demonstrates, VM did not decline to investigate the claim, did not refuse to participate in settlement negotiations and did not ignore any settlement demands.  To the contrary, VM took all reasonable steps to investigate Noonan's claim. Its investigation was hindered, however, by the actions of Noonan and his attorney Gorewitz, who ignored requests for medical documentation and information.  Thus, due to the actions of Noonan and Gorewitz, VM was not able to gather sufficient information regarding the claim until after suit was filed.  Once Noonan's medical records were finally received, VM tendered its policy limit within days.

In addition, the recent landscape of "bad faith" decisions does not support a finding of "bad faith" in this case.   An insurer is within its right to take steps to investigate a claim made against a large policy and is not in "bad faith" simply because it requests medical documentation to support a claim.   An insurer's request for medical records is not only reasonable, it is justifiable because (as in this case) the medical records frequently reveal facts which create potential issues as to liability and damages that otherwise might not have been discovered during the claims evaluation process.

This "bad faith" action lacks any foundation.  The Noonans are unable to offer any facts that support such a claim.  VM was not obligated to tender its policy limits in the absence of a demand and in the absence of any medical documentation.  As has been borne out in this nation's recent financial crisis, a financial institution that fails to require

reasonable documentation for the risks it takes will quickly become insolvent. VM's requests for documentation of plaintiff's injuries were reasonable and justified. A claim for bad faith based upon an insurer's purported failure to "timely" tender its limit cannot stand when a plaintiff or plaintiff's counsel contributes to or causes the delay by failing to provide medical documentation. Accordingly, summary judgment is warranted.

## II.    STANDARD OF REVIEW

The Court may grant summary judgment "if the pleadings, the discovery, the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56 (c)*. The moving party bears the initial responsibility of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the movant meets this burden, it shifts to the non-moving party, who must then show that there is some "metaphysical doubt" as to the material facts. *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings" but must instead come forward with "specific facts showing that there is a genuine issue for trial." *Id. at 587; Fed.R.Civ.P. 56 (c)*. If the evidence brought forth by the non-moving party is "merely colorable or is not significantly probative, then summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967)).

Although the issue of whether an insurer acted in "bad faith" was once regarded as a question for the jury, several recent district court decisions have disposed of "bad faith" claims at the summary judgment stage. *See Shin Crest Pte, Ltd. v. AIU Ins. Co.*,

605 F. Supp. 2d 1234 (M.D. Fla. 2009)(finding insurer's actions did not, as a matter of law, constitute bad faith); *Maldonado v. First Liberty Ins. Co.*, 546 F. Supp. 2d 1347 (S.D. Fla. 2008)(holding that insurer did not act in bad faith as a matter of law); *Aboy v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 727967 (S.D. Fla.)(recognizing that courts may resolve bad faith claims on the pleading and enter summary judgment in favor of the insurer); *Johnson v. Geico Gen. Ins. Co.*, 318 Fed. Appx. 847 (11th Cir. 2009)(affirming entry of summary judgment in favor of insurer of bad faith claim).

### III.          STATEMENT OF UNDISPUTED FACTS

1.      On October 17, 2005, Noonan was injured when his motorcycle collided with the side of a motor vehicle operated by Robbins as Robbins turned into the parking lot of Holmes Regional Medical Center.[2]

2.      At that time, Robbins was insured under an auto policy issued by VM with policy limits of $100,000 "each person" and $300,000 "each occurrence."  The vehicle that Robbins was operating at the time of the accident was owned by his sister, Elizabeth Powers (who Robbins was visiting as she was dying of cancer in the hospital), and was insured under an Allstate auto liability policy with limits of $100,000 "each person" and $300,000 "each occurrence." [3]

3.      On October 31, 2005, VM was notified of the accident by Allstate.[4]

4.      On or about November 1, 2005, VM and Allstate agreed that Allstate would assume the role of the primary insurer and VM would assume the role of the excess insurer under the circumstances.[5]

---

[2] *See* accident report, attached as composite Exhibit A.
[3] *See* Allstate policy declarations, attached as Exhibit B, and *see* Vermont Mutual policy declarations, attached as composite Exhibit C.
[4] *See* ACORD loss notice, attached as Exhibit D.

5.      Allstate informed VM that Noonan had retained Gorewitz, that Noonan received severe head injuries and was in the intensive care unit at the hospital.   Allstate also advised that Robbins had received a citation for failing to yield the right of way.[6]

6.      On November 2, 2005, VM noted that Allstate would be performing all "front work" for the claim, and that Robbins had no information as to Noonan's injuries. VM also sent a letter **requesting Allstate's full investigative file to date, including all injury-related information**. (emphasis added).[7]   On this day, VM roundtabled the file and increased its reserve to $100,000 indicating that it did not have the police report (thus speed or alcohol could be an issue) and noting that it needed to determine if there was umbrella coverage available to Powers, the Allstate insured.[8]

7.      On November 14, 2005, VM noted that it was the excess carrier under the circumstances and that the claim appeared to have a value in excess of $200,000.[9]

8.      On November 17, 2005, VM received the police report from the accident and noted that it was not favorable to Robbins.  VM also received a letter from Allstate enclosing a letter from Gorewitz requesting Allstate disclosure information and requesting that Allstate forward the letter to all other known insurers.  Allstate advised VM that it was offering its $100,000 limit to Noonan/Gorewitz.[10]

9.      On or about November 21, 2005, Allstate tendered its policy limit.[11]

10.      On or about November 23, 2005, VM received Allstate's investigative file.  The file contained no medical records or bills.[12]

---

[5] *See* Vermont Mutual claims note dated November 1, 2005, attached as composite Exhibit E.

[6] *See* Vermont Mutual claims note dated November 1, 2005, attached as composite Exhibit E.

[7] *See* Vermont Mutual claims note dated November 2, 2005, attached as composite Exhibit E, and Vermont Mutual letter to Allstate dated November 2, 2005, attached as Exhibit F.

[8] *See* Vermont Mutual claims note dated November 2, 2005, attached as composite Exhibit E.

[9] *See* Vermont Mutual claims note dated November 14, 2005, attached as composite Exhibit E.

[10] *See* Vermont Mutual claims note dated November 17, 2005, attached as composite Exhibit E.

[11] *See* Allstate letter to Gorewitz, dated November 21, 2005, attached as Exhibit G.

11.     On or about December 1, 2005, VM sent a letter to Gorewitz disclosing its policy limit and **requesting that Gorewitz forward Noonan's medical bills, a hospital admission, discharge records and any operative reports, also requesting that Gorewitz contact VM to discuss the claim**. (emphasis added).[13]

12.     Also on December 1, 2005, Allstate advised VM (apparently based on representations by Gorewitz) that Noonan was out of a coma and looking to transfer to a long term care facility and that it was unknown whether Noonan suffered brain damage. Allstate confirmed, however, that it had no medical bills or records.[14]

13.     On or about December 1, 2005, VM contacted Gorewitz's office and spoke to a paralegal.  VM informed the paralegal that the Allstate release between Noonan and Powers (hereinafter the "Powers release") also released Robbins, which would effectively mean that VM would not be liable for any excess.  VM noted that the paralegal would advise Gorewitz of this mistake and have Gorewitz contact VM.[15]

14.     On or about December 20, 2005, VM sent a letter to Gorewitz enclosing a certified copy of the policy and **requesting that he provide Noonan's medical bills or records**. (emphasis added).[16]

15.     On January 13, 2006, VM received a letter from Allstate advising that Gorewitz was revising and removing Robbins and VM from the Powers release.[17]

---

[12] *See* Allstate letter to Vermont Mutual dated November 10, 2005 and investigative file, attached as composite Exhibit H and Vermont Mutual claims note dated November 23, 2005, attached as composite Exhibit E.
[13] *See* Vermont Mutual letter to Gorewitz dated December 1, 2005, attached as Exhibit I.
[14] *See* Vermont Mutual claims note dated December 1, 2005, attached as composite Exhibit E.
[15] *See* Vermont Mutual claims note dated December 1, 2005, attached as composite Exhibit E.
[16] *See* Vermont Mutual letter to Gorewitz dated December 20, 2005, attached as Exhibit J.
[17] *See* Allstate letter to Vermont Mutual dated January 9, 2006, attached as Exhibit K and Vermont Mutual claims note dated January 13, 2006, attached as composite Exhibit E.

16.    On January 26, 2006, VM noted that it would settle the claim **once it received either a bill from the hospital or a report on Noonan's injuries and condition**. (emphasis added).[18]

17.    On February 9, 2006, VM requested Allstate to provide a copy of the Powers release **and to forward all medical records and bills**. (emphasis added).  On February 10, 2006, Allstate advised VM **that it had no medical records or bills**. (emphasis added).[19]

18.    On April 14, 2006, VM contacted Allstate to discuss the status of the claim.  On April 17, 2006, Allstate advised **that it had no medical records or bills** (emphasis added), and that it had not yet received the Powers release from Gorewitz.[20]

19.    On May 17, 2006, VM sent a letter to Gorewitz requesting the medical status of Noonan, **requesting him to provide Noonan's medical records and bills** and requesting a copy of the Powers release. (emphasis added).[21]

20.    On or about June 15, 2006, VM **requested Allstate to forward Noonan's medical records and bills**. (emphasis added)[22]

21.    On July 11, 2006, VM was notified that Noonan had filed suit against Robbins.   Allstate advised it would assign defense counsel, have defense counsel immediately subpoena Noonan's medical records, and forward the records to VM.[23]

---

[18] *See* Vermont Mutual claims note dated January 26, 2006, attached as composite Exhibit E, stating to wit: "if we can just get the bill from the hospital and the (sic) some kind of report on the clmts injury and condition we could attempt to settle our portion of this claim and get case settled."

[19] *See* Vermont Mutual claims notes dated February 9, 2006 and February 10, 2006, attached as composite Exhibit E.

[20] *See* Vermont Mutual claims notes dated April 14, 2006 and April 17, 2006, attached as composite Exhibit E.

[21] *See* Vermont Mutual letter to Gorewitz dated May 17, 2006, attached as Exhibit L.

[22] *See* Vermont Mutual claims note dated June 15, 2006, attached as composite Exhibit E.

[23] *See* Vermont Mutual claims note dated July 11, 2006, attached as composite Exhibit E.

22.     On July 28, 2006, VM sent a letter to Gorewitz **requesting him to provide Noonan's medical bills, the hospital admission, discharge records, operative reports, and any rehabilitation records**. (emphasis added)[24]

23.     On July 31, 2006, defense counsel issued subpoenas to Holmes Regional Medical Center and Health First Business Center for Noonan's medical records.[25]

24.     On August 3, 2006, Gorewitz filed objections to all of the subpoenas issued by defense counsel contending they sought original records, not copies.[26]

25.     On August 8, 2006, defense counsel requested that Gorewitz drop his objections or face a motion to compel.  Thereafter, Gorewitz withdrew his objections.[27]

26.     On August 15, 2006, VM received defense counsel's initial litigation report which noted that: (1) Robbins appeared to be liable for the accident; (2) no demand had ever been made by Noonan/Gorewitz to either Allstate or VM; (3) no medical records had been received by either Allstate or VM; and (4) preliminary investigation revealed that at the time of the accident construction was going on in that area.[28]

27.     On August 30, 2006, VM finally received Noonan's medical records and bills.  Some of the medical records revealed and/or suggested that the accident had occurred at a time when Noonan apparently had a seizure and ran into [Robbins's] car.[29]

---

[24] *See* Vermont Mutual letter to Gorewitz dated July 28, 2006, attached as Exhibit M.

[25] *See* Subpoenas *Duces Tecum* to Holmes Regional Medical Center and Health First Business Center, attached as composite Exhibit N.

[26] *See* Plaintiffs' Objections to Defendant's Subpoenas *Duces Tecum*, attached as composite Exhibit O.

[27] *See* letter from Virgil Wright to Gorewitz dated August 8, 2006, attached as composite Exhibit P.

[28] *See* Defense Attorney's Initial Suit Report dated August 15, 2006, attached as composite Exhibit Q.

[29] *See* medical records dated October 17, 2005 and October 25, 2006, attached as composite Exhibit R.  The medical records reflect the following findings:  On October 17, 2005, a trauma history and physical was completed by Albert Titus, M.D. which noted "the patient is a 56-year-old male riding a motorcycle, *apparently had a seizure, ran into back of a car…*" (emphasis added).  On October 21, 2005, an otolaryngology head and neck surgery consultation was completed by James Go, M.D., who noted the history of present illness as the following: "this 56-year-old male was riding a motorcycle. *The patient had a seizure and ran into the back of a car.*"  On October 25, 2005, a CT of the head was taken and revealed an *old subdural hematoma from possible prior trauma*.  (emphasis added).

28.     On September 6, 2006, **only seven days after receiving the medical records,** VM decided to tender of its policy limit.  On September 8, 2006, VM contacted defense counsel and left a message asking him to tender its policy limit.  On September 15, 2006, VM issued a check for its $100,000 policy limit and sent the check to defense counsel to tender to Gorewitz.[30]

29.     On or about October 13, 2006, defense counsel informed VM that Noonan/Gorewitz had rejected VM's tender as untimely.[31]

**IV.     CHOICE OF LAW**

Florida courts have recognized that while the rights and risks of parties in matters of insurance "coverage" are determined under the *lexi loci contractus* doctrine, a "bad faith" case raises questions of "performance" under the insurance contract.  *Lumbermans Mut. Cas. Co. v. August*, 530 So.2d 293, 295-96 (Fla. 1988); *Clifford v. Commerce Ins. Co.*, 2009 WL 3387737 (S.D. Fla.).  Matters concerning performance of a contract are determined by the law of the place of performance.  *Government Employees Ins. Co. v. Grounds,* 332 So.2d 13, 15 (Fla. 1976).  To determine the place of "performance," courts have considered (1) whether the tort action was brought in Florida, (2) whether the insurer defended the action in Florida, and (3) whether the insurer engaged in settlement negotiations in Florida, regardless of where the insurance contract was "executed."  *Clifford*, 2009 WL 3387737 at 1.

The second and third factors set forth in *Clifford* are not present in this case.  As an initial matter, the insurance policy, the insurer, and the insured have no relationship to

---

[30] *See* Vermont Mutual claims notes dated September 6, 2006 and September 8, 2006, attached as composite Exhibit E and Vermont Mutual letter to Virgil Wright, Esquire, dated September 15, 2006, attached as Exhibit S.
[31] *See* e-mail correspondence to Vermont Mutual dated October 13, 2006, attached as Exhibit T.

Florida.[32]   Regarding the defense of the underlying action, it was Allstate, not VM, that defended Robbins in Florida.  VM had no duty to defend because of its excess status.  Further, VM did not participate in any settlement negotiations in Florida, as Noonan never made a demand upon VM.  Also, all claims handling of Noonan's claim by VM occurred in Vermont, not Florida.  VM's requests for information to Allstate and Gorewitz were made by VM claims employees from their Vermont offices.  Therefore, although one could argue that Florida law might apply to Allstate (who is not a party and whose conduct is not in question), it has no application to VM.

The only contact that VM had with Florida during the claims investigation process was when VM sent letters requesting medical documentation to Gorewitz and Allstate's defense counsel.  Under the rationale set forth in *Grounds* and *Clifford*, VM's act of sending letters requesting medical records from its Vermont location falls far short of "performance" of the contract in Florida under *Grounds* and *Clifford*.  Thus, *t*he question of VM's alleged "bad faith" must be determined under Vermont law.

## V.    ARGUMENT

Noonan alleges that VM was obligated to tender its policy limit more expeditiously than it did, notwithstanding that Noonan had not made a demand and notwithstanding that Noonan and his counsel failed to provide any medical documentation whatsoever despite numerous requests.  As set forth herein, there is a complete absence of evidence to support a claim for "bad faith."[33]

---

[32] Robbins was a New Hampshire resident at the time of the accident.  Vermont Mutual is a corporation borne under the laws of Vermont with its principal place of business in Montpelier, Vermont.  Vermont Mutual is not licensed in Florida and does not conduct business in Florida.  The policy at issue was issued by Vermont Mutual in Vermont and delivered to Robbins in New Hampshire.

[33] In Florida, the applicable standard of care for insurers has been set forth in *Boston Old Colony v. Gutierrez*, 386 So.2d 783, 785 (Fla. 1980), as follows:

### A.   Noonan's Claim For Bad Faith Fails Because There Was No Demand.

#### 1.   Noonan's Claim Fails Under Vermont Law.

There is no Vermont case finding insurer "bad faith" in the absence of a demand for settlement. The existence of a demand appears to be an implicit prerequisite to a "bad faith" action premised on an insurer's failure to settle.[34] Every Vermont decision finding "bad faith" on the part of an insurer involves facts where a demand for settlement had been made. *See, e.g., Johnson v. Hardware Mut. Cas. Co.*, 1 A.2d 817, 824-25 (Vt. 1938)(finding bad faith where insurer failed to accept a settlement offer); *Myers v. Ambassador Ins. Co., Inc.*, 508 A.2d 689, 692 (Vt. 1986)(finding bad faith where insured was not notified of any developments in the lawsuit, including a demand and settlement negotiations, until after an excess judgment was entered against him).

Here, no settlement demand was ever made upon VM by Noonan before VM tendered its policy limit. In the absence of any Vermont case finding "bad faith" where there had been no demand, this is not a case where this Court should entertain the idea of creating new Vermont law. Accordingly, this Court should grant summary judgment in favor of VM because VM's tender was not "untimely" as a matter of law.

#### 2.   Noonan's Claim Also Fails Under Florida Law.

---

"An insurer in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business….The good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so."

[34] Although no Vermont court has specifically set forth this prerequisite, a demand is generally considered a prerequisite to a finding of bad faith in other courts. *See, e.g., Pavia v. State Farm Mut. Auto. Ins. Co.*, 626 N.E.2d 24 (N.Y. 1993)("Naturally, proof that a demand for settlement was made is a prerequisite to a bad faith action against an insurer for failure to settle").

Under Florida law, the general rule is that the insurer will not be liable for an excess verdict if there is no offer to settle within the policy limits. *Davis v. Nationwide Mut. Fire Ins. Co.,* 370 So.2d 1162, 1163 (Fla. 1st DCA 1979). While there is a "*Powell*" exception to the general rule, it has no applicability to the facts presented in this case. *Powell v. Prudential Prop. & Cas. Ins. Co*., 584 So. 2d 12 (Fla. 3rd DCA 1991).

The facts of *Powell* are very different from the facts of this case. In *Powell*, the insured struck two pedestrians, one of whom suffered serious injuries. *Id*. at 13. Within days, Prudential evaluated the insured's liability at almost 100% and noted that the policy limit was only $10,000. *Id*. Thereafter, Prudential received three letters from the attorney representing the seriously injured pedestrian, which described the nature of his client's injuries, advised Prudential that his client would remain hospitalized and needed immediate funds to continue to pay for the medical treatment, and requested that Prudential disclose its policy limit so that the case could be resolved within limits. *Id*. Prudential never responded and also never advised its insured as to the settlement overtures. *Id*. When Prudential finally tendered its minimal policy limit, the tender was rejected and an excess judgment was subsequently entered against the insured. *Id*.

On appeal after the trial court entered summary judgment for Prudential, the Third District Court of Appeal admonished Prudential's conduct. *Id*. at 14. The court stated that, first, the lack of a formal demand does not preclude a finding of bad faith, but is just merely one factor to be considered. *Id*. Second, bad faith may be inferred from a delay in settlement negotiations which is willful and without reasonable cause. *Id*. Third, where liability is clear and injuries are so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations. *Id*.

*Powell* is easily distinguishable from this case for several reasons. First, since the *Powell* decision in 1991 no Florida court has ever applied its holding to an excess carrier. It is undisputed that VM was excess in this case. Second, *Powell* involved an insurance policy with minimal $10,000 limits. In contrast, VM's policy limit was $100,000, and its $100,000 sat above Allstate's $100,000 limit.

Third, one cannot say that liability was clear in this case. As stated in the Facts section above, the medical records indicated that the accident may have been caused in whole or in part by Noonan having a seizure immediately preceding the accident.[35] Fourth, one cannot say that VM knew Noonan's injuries were so serious that a judgment in excess of the policy limit was "likely," when VM had no documentation of Noonan's injuries and where it took a motion to compel to obtain such information.

Fifth, unlike Prudential in the *Powell* case, there is no evidence in this case that VM engaged in any delay that was either "willful" or "without reasonable cause." To the contrary, VM took steps to investigate the claim by requesting Allstate's file and by requesting medical documentation from Gorewitz and Allstate on numerous occasions. Also, there is no evidence that VM ignored a (nonexistent) settlement demand or failed to advise the insured of a demand, or failed to disclose its policy limit in a timely manner. The *Powell* decision simply has no application to the facts of this case.

Thus, even though VM contends that Vermont law applies rather than Florida law, even under Florida law it is clear that VM cannot be held in bad faith because there was no demand for settlement before VM tendered its policy limit, and because the *Powell* exception cannot apply under the circumstances of this case.

**B.      VM Was Entitled To Investigate Noonan's Claim.**

---

[35] *See* composite Exhibit R.

Even under Florida law it is axiomatic that an insurer is allowed a reasonable time to investigate a claim and no obligation exists to tender the policy limits in advance of a settlement offer without time for investigation. *Johnson v. Geico Gen. Ins. Co.*, 318 Fed. Appx. 847, 851 (11th Cir. 2009). An insurer's good faith duty includes an obligation to investigate the facts and evaluate the merits of a claim. *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So.2d 783, 785 (Fla. 1980); *DeLaune v. Liberty Mut. Ins. Co.*, 314 So.2d 301 (Fla. 4th DCA 1975). Even if some information is provided by the claimant an insurer may still conduct its own investigation. *DeLaune*, 314 So.2d at 603.

VM not only had the right to conduct an investigation of Noonan's claim, the evidence is indisputable that VM took all reasonably necessary steps to do so. No obligation to tender its policy limit arose until the investigation was complete. Once VM finally received the medical records it had been requesting for approximately nine months, it tendered the policy limit within days.

**C.    VM Lacked Sufficient Information Regarding Noonan's Claim Despite Its Requests For Same.**

Noonan alleges in this action that VM failed to timely settle the claim and alleges that VM had sufficient information that Noonan's damages greatly exceeded its policy limits. Noonan has yet to explain what constitutes "sufficient" information, given that Noonan and Gorewitz withheld all medical documentation from VM until they could no longer do so without potentially being subject to sanctions in a motion to compel. Noonan must not be allowed to use his own refusal to provide any information to create an alleged "bad faith" case against VM.

**1.    Noonan Hindered VM's Investigation.**

A plaintiff's failure to aid in the investigation of an insurance claim is a factor weighing against a finding of bad faith. *See Parker v. D'Avolio*, 664 N.E.2d 858 (Mass. 1996)("in the context of insurance claims, the plaintiff has a reciprocal duty to be straightforward and forthcoming in providing the information necessary to the defendant's evaluation of the claim"). Here, Noonan/Gorewitz did more than "fail to aid" VM. They took affirmative steps to hinder VM's investigation. VM had no means of collecting medical documentation on its own during the pre-suit period absent Noonan's and Gorewitz's cooperation. As the uncontested facts indicate, Noonan and Gorewitz never responded to VM's repeated requests for medical records and never engaged in any settlement discussions with VM, opting instead to file suit against Robbins. Gorewitz's actions of blocking access to Noonan's medical records continued even after suit was filed.[36] Therefore, VM's purported "failure" to obtain sufficient information as to Noonan's injuries and damages falls squarely on Noonan and Gorewitz.

The type of conduct evinced by Noonan and Gorewitz is not only disfavored, it has also been fatal to a later action for "bad faith" based on an insurer's alleged failure to "timely" settle. In *Aboy v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 727967 (S.D. Fla.), the Southern District addressed a "bad faith" claim premised upon State Farm's alleged failure to timely tender its limit. The court was not persuaded by the plaintiff's contention that State Farm was obligated to move forward with settlement negotiations even though the plaintiff repeatedly ignored State Farm's requests for medical records. *Id*. at 5. The court disposed of the case by entering summary judgment in favor of State

---

[36] In a rather transparent effort to further stall Vermont Mutual's receipt of Noonan's medical records, Gorewitz filed objections to the multiple subpoenas issued to the medical providers predicated on the basis that defense counsel sought original records, not copies. As a plain reading of the subpoenas indicates, the records sought were copies and not originals. Gorewitz withdrew his objections only after defense counsel threatened a Motion to Compel.

Farm. *Id*. at 6.  The same result should obtain in this case.  Likewise, in *Dauro v. Allstate Ins. Co*., 114 Fed. Appx. 130, 135 (5th Cir. 2004), the Fifth Circuit refused to find "bad faith" and granted summary judgment for Allstate, who paid a claim one month after it received the claimant's medical records and where the delay in evaluating the claim was due in part to the claimant's refusal to provide the records.  A district court in Kansas reached a similar conclusion by entering summary judgment in favor of an insurer. *Williams v. American Family Mut. Ins. Co*., 101 F.Supp.2d 1337 (D. Kan. 2000).  The court found that the insurer had taken reasonable steps to gain medical documentation but the plaintiff's attorney had failed to supply it.  *Id.* at 1342.

In addition, the case law does not require an insurer to harass a claimant to provide medical records.  *Aboy*, 2010 WL 727967 at 4 (finding that insurer was under no obligation to harass claimant for his medical records after insurer's requests for same went unanswered); *Maldonado v. First Liberty Ins. Corp*., 546 F.Supp.2d 1347, 1358-59 (S.D. Fla. 2008)(recognizing a limit as to what steps an insurer must take to obtain cooperation from a party).  All of the above cases stand for the same proposition, i.e., that a claim for "bad faith" premised on an insurer's failure to timely tender fails when a plaintiff contributes to or causes the delay by failing to provide medical documentation.

## 2.   Allstate Also Failed To Provide Sufficient Information.

In addition to attempting to collect medical records from Noonan and Gorewitz, VM requested medical documentation from Allstate.  VM was unable to gather any medical documentation from Allstate, however, most likely because Noonan and Gorewitz refused Allstate's requests as they had refused VM's requests.

Although Allstate bore the role of primary insurer, it only provided limited information to VM. Thus, the extent of Noonan's injuries was still largely unknown to VM. Notably, the information provided by Allstate to VM was *not* based on Allstate's review of any medical records, because Allstate did not have possession of Noonan's medical records until on or about August 30, 2006, the same date that VM received the records. Allstate's investigative file, which was provided to VM during the pre-suit claims investigation process, did not contain any medical records.

Therefore, while Allstate may have believed, based on verbal representations, that Noonan suffered injuries related to the accident, the record evidence is clear that VM obtained no medical documentation as to Noonan's injuries or treatment (despite its request for same) from Allstate regarding the claim.[37] Further, VM was still entitled to conduct its own investigation into the claim and collect the documentation necessary to complete its evaluation. *See DeLaune v. Liberty Mut. Ins. Co.,* 314 So. 2d 601 (Fla. 4th DCA 1975)(one party does not have to accept at face value the medical information furnished by the other party without any inquiry).

### 3.    Noonan's Medical Records Created Issues As To Liability And Damages.

Medical records are crucial to an insurer's investigation of a claim involving personal injuries. Without medical documentation, insurers are often blind as to issues relating to both liability and damages. Thus*, in Beckwith v. Campbell*, 2009 WL 4894463 (Mass. Super. 2009), an insurer's decision to not increase a settlement offer to an injured party stemming from an automobile accident without further medical documentation was found not to be in "bad faith." Once the insurer received the medical records, which as in

---

[37] Vermont Mutual requested Noonan's medical records from Allstate on at least three occasions.

this case were obtained only through discovery after suit was filed, the medical records revealed that the plaintiff had been involved in a prior motorcycle accident, was totally disabled and his back injuries were related to the prior accident. *Id*. at 2. *See also McLendon v. Wal-mart Stores, Inc*., 521 F.Supp.2d 561 (S.D. Miss. 2007)(finding that medical records indicated prior injuries and insurer's three month time period in reviewing and evaluating claim due to contents of medical records was valid).

Even if hindsight reveals that an insurer's investigation into a claimant's medical records is fruitless, that fact alone does not establish that an investigation proceeded in bad faith. *McLendon,* 521 F. Supp. 2d at 567; *Pavia v. State Farm Mut. Auto. Ins. Co*., 626 N.E.2d 24, 29 (N.Y. 1993)(the fact that insurer's preliminary liability forecasts were unfavorable and that the investigation ultimately proved those forecasts correct does not establish that the insurer was unjustified in engaging in further investigation and failing to effectuate an earlier settlement.   If the insurer had failed to conduct a continuing inquiry, it would have breached its obligation to investigate and defend the insured).

The case of *Wade v. Nguyen*, 483 F.3d 657 (10th Cir. 2007) is also informative. In *Wade*, an automobile accident occurred in which the insured was at fault and the other driver suffered a spinal cord injury that rendered him quadriplegic. *Id*. at 664.   Due to what plaintiff's counsel described as the insurer's "reckless and mindless" refusal to apply reason and settle the underlying claim in a timely manner, a consent judgment was entered in excess of the policy limits and a "bad faith" claim was pursued against the insurer. *Id*. at 664.   The district court granted summary judgment in favor of the insurer, and the Tenth Circuit affirmed. *Id*. at 665.   In its analysis, the court recognized that the conduct of the plaintiff was relevant to its determination of whether bad faith had indeed

occurred and found that the insurer had on several occasions requested medical records from plaintiff's counsel, and that counsel agreed to send the records but never did. *Id.* at 671. After suit was filed, plaintiff's counsel continued to make it difficult for the defense to obtain the relevant medical records by waiting four months after settlement offers had expired to finally provide the records. *Id.* The court found that the medical records were relevant as the insurer did not have information as to whether the accident and the plaintiff's paraplegic condition were connected and whether or not there could have been a claim of malpractice against the hospital. *Id.*

The reasoning of *Beckwith* and *Wade* is sound and is supported in this case. Once Noonan's medical records were finally received during discovery, the contents of the medical records suggested that Noonan may have been partially at fault for the accident (because of his seizure) and also revealed that he had pre-existing medical conditions. *See* fn28 *supra.* Thus, it cannot be said that VM's request for medical information in an attempt to confirm liability and the extent of Noonan's injuries that might be attributable to this incident was in "bad faith."

### C.   VM Never Refused To Settle.

The gravamen of this "bad faith" action is not that VM "refused" to settle (as it is uncontested that a demand was never made prior to VM's tender), but rather that VM "delayed" in tendering its limits and did not "timely" settle the claim when it should have. Several jurisdictions have recognized a fundamental difference in bad faith actions premised on an insurer's "refusal to settle" compared to an insurer's failure to "timely" settle a claim, finding that the latter often invokes the proverbial "red flag" indicating a "created" bad faith case. *Pavia,* 626 N.E.2d at 28 (finding that the plaintiff failed to

establish bad faith as the plaintiff controlled the time period when the insurer tendered its limit and plaintiff's bad faith action was premised upon the insurer's failure to timely tender); *see also Peckham v. Continental Casualty Insurance Co.*, 895 F.2d 830, 835 (1st Cir. 1990)("the doctrinal impetus for insurance bad faith claims derives from the idea that the insured must be treated fairly and his legitimate interests protected…in other words, the justification for bad faith jurisprudence is as a shield for insureds—not as a sword for claimants.  Courts should not permit bad faith in the insurance milieu to become a game of cat-and-mouse between claimants and insurer, letting claimants induce damages that they then seek to recover, whilst relegating the insurer to the sidelines as if only a mildly curious spectator").

Florida also disfavors "created" bad faith claims based on the conduct of the plaintiff or plaintiff's counsel.  As stated in his dissent in *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 686 (Fla. 2004), Justice Wells opined that the courts have the responsibility to reserve bad faith damages, which is limitless court-created insurance, to egregious circumstances of delay and bad faith.[38]  *Id*. at 686.  The courts likewise have the responsibility not to allow contrived bad faith claims that are the product of sophisticated legal strategies rather than the product of actual bad faith.  *Id*.

Justice Wells' reasoning in *Berges* could not be more on point.  This Court should differentiate between legitimate allegations of insurer bad faith, which need to litigated, and the allegations of bad faith in cases where any alleged delay in settling resulted from a plaintiff's failure to provide documentation and/or a plaintiff's "bad faith setup," which should be dismissed as a matter of law.  Gorewitz was capable of retracting a release

---

[38] Justice Wells' dissent in *Berges* was recognized and discussed by this Court in its opinion in *Shin Crest Pte, Ltd. v. AIU Ins. Co.*, 605 F. Supp. 2d 1234 (M.D. Fla. 2009).  In particular, this Court found the dissent to be "thorough and well-reasoned."  *Id*. at 1243.

when VM made his paralegal aware that the release would extinguish his client's rights as against Robbins, however he was unable to provide medical records, or a medical authorization to move the case toward settlement.  The facts in this case reveal exactly what courts should be wary of, as Noonan and Gorewitz (1) controlled the flow of information to VM, (2) chose to not disclose any information or documentation, and then (3) once the documentation was received and VM tendered its limit, and (4) accused VM of being too late in tendering its limit.  Such facts are not legitimate facts of "bad faith" which need to be litigated, but are instead facts of an alleged delay directly attributable to plaintiff's conduct, which should be ended at the summary judgment stage.

### D.   VM More Than Met Its Duty Of Good Faith.

Based upon the uncontroverted facts in this case, no reasonable jury could find that VM acted in its own best interests and in disregard for the interests of its insured. Under Vermont law, Florida law, and the law of other jurisdictions as discussed above, the uncontroverted facts indicate that VM complied with the duty owed to its insured in this case.  *See, e.g., Boston Old Colony*, 386 So. 2d at 785.  VM investigated the facts, attempted to gather medical documentation, was prepared to tender its limits upon receipt of minimal medical records or bills, and did so virtually immediately upon such receipt.

The record is devoid of any facts demonstrating that VM attempted to avoid or delay settlement, or that VM was more concerned with its own interests than those of its insured.  *See Macola v. Government Employees Ins. Co*., 953 So. 2d 451, 455 (Fla. 2000); *Allstate Indem. Co. v. Ruiz*, 899 So. 2d 1121, 1125 (Fla. 2005).  Whether under Vermont law, Florida law, or the law of other jurisdictions discussed above, the facts in this case do not come close to supporting a claim for alleged "bad faith."

Under Vermont law, an insurer's right to conduct an adequate investigation of a claim is well-recognized. *Bushey v. Allstate Ins. Co.*, 670 A.2d 807, 810 (Vt. 1995). Bad faith has been found only where a plaintiff has established an insurer's *intentional* disregard of the insured's financial interests in hopes of escaping the full responsibility imposed upon it by its policy. *Johnson v. Hardware Mut. Casualty Co.*, 1 A.2d 817, 820 (Vt. 1938). (emphasis added). There is no evidence in this case suggesting that VM disregarded Robbins' financial interests, let alone *intentionally* disregarded his interests, by asking for minimal medical documentation.

## VI.    CONCLUSION

Vermont law applies. Summary judgment in favor of VM is appropriate because VM tendered its policy limit before any demand had been made. Summary judgment is also appropriate because VM properly investigated the claim, requested medical information on multiple occasions, and tendered its policy limit within days of receiving that information. Summary judgment is also appropriate because any delay in VM's policy limit tender is directly attributable to plaintiff's own neglect, or more likely, an attempted bad faith setup.

Even assuming for the sake of argument that Florida law applies, summary judgment is appropriate for all of the same reasons. The *Powell* exception does not apply for the reasons stated above. Moreover, an insurer cannot evaluate a claim as likely to exceed its policy limits when the insurer has nothing but verbal representations regarding the claimant/plaintiff's injuries without any supporting documentation.

For the above reasons, VM respectfully requests that summary judgment be entered in its favor.

Respectfully submitted,

/s/ John R. Catizone
JOHN R. CATIZONE
Florida Bar No.: 695491
catizone@litchfieldcavo.com
E. BROOKE PANAGAKOS
Florida Bar No.: 0029312
panagakos@litchfieldcavo.com
Litchfield Cavo, LLP
600 Corporate Drive, Suite 600
Fort Lauderdale, FL  33334
954.689.3000 (Tel.)
954.689.3001 (Fax)
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 3rd day of August, 2010, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Fred A. Cunningham, Esquire
Gregory Yaffa, Esquire
Slawson, Cunningham, Whalen & Gaspari, P.L.
2401 PGA Boulevard, Suite 140
Palm Beach Gardens, FL 33410
*Attorney for Plaintiffs*

/s/  John R. Catizone
JOHN R. CATIZONE